At a Court of Oyer and Terminer held at this term, Joseph W. Pratt was indicted and tried for the murder in the first degree of Joshua Pusey Smith, in the city of Wilmington on the 29th day of April preceding. It appeared from the evidence that both of the parties had formerly resided and been intimate acquaintances in the State of Pennsylvania, bus had removed with their families a few years before to the city of Wilmington, the deceased in the year 1858 or 1859 and the prisoner in 1864, and that the deceased at the time of the alleged murder was keeping the Indian Queen hotel in that city, and the prisoner and his family, consisting of himself, his wife and a son fourteen years old resided in a house on Seventh street owned by the *Page 251 
deceased. In 1865 the prisoner made a protracted visit to West Virginia leaving his family in Wilmington, but returned there on Monday, the 15th of last month, and went the next day to the city of New York and came back to Wilmington at midnight on the next Friday, the 26th of that month. The deceased was at that time having some of the rooms re-papered in the second story of the house in which the prisoner and his family resided, and was in the house on Saturday, the following day, to see how the work was progressing, and to learn what Mrs. Pratt, the wife of the prisoner, thought of the new paper he was having put on the rooms. That morning the prisoner played checkers with his son while his wife was preparing breakfast, but after breakfast he walked about the house from one room to another without staying long in any one place. Afterwards his wife went to market and he went with her, and they returned to the house together between 8 and 9 o'clock. He then sat down in the sitting room and talked with his wife in the presence of the young woman who gave this evidence, and afterwards left the house with his son, and returned without him about 3 o'clock in the afternoon while his wife was preparing dinner, and soon after he and his wife sat down and took dinner together. On leaving the house with his son they went together to the railroad depot where he purchased two tickets, one for himself to Elkton and the other for his son to Newark, and sent him there to collect two bills for him by the half past 9 o'clock A. M. train, and who did not return until the following Monday after the fatal attack had been made upon the deceased. The call of the deceased before mentioned at the house that morning was after the prisoner and his son had left it as above stated, and while there he requested the prisoner's wife to go to the rooms above to assist him in measuring them for the paper, and she complied with his request.
The witness then stated that she returned to the house of the prisoner the following Monday morning about half *Page 252 
past 7 o'clock, and finding the front door locked went round to the back door and was let into the kitchen door by him with a friendly "good morning," and she passed from it into the sitting room. The prisoner then came into the sitting room from the kitchen without any coat on and complained of having the headache, but soon went out into the kitchen again, and his wife went up stairs, but soon a woman came in for a moment, the prisoner put on his hat and went into the sitting room, and which he again re-entered through the entry door as the woman was passing out of it. He and his wife then went out of it into the kitchen and shut the door and remained there some time, and were there when the deceased entered the front door, walked to the sitting room door opening into the passage, looked in and bidding her good morning as she sat sewing by the window in it, and enquired of her if the paper-hangers had come, she informed him they had and had been at work some time, he at once turned from the door and went up stairs, but had hardly more than reached the head of them and the floor above, before his wife re-entered the sitting room from the kitchen followed by the prisoner, when she observed to her that Mr. Smith had come, to which she replied that she had heard him when he came in. The prisoner then proceeded to the entry door, but halted for a second perhaps, at the foot of the settee just at the door, then passed out of it and ran rapidly up stairs, while his wife looked anxious and worried and walked towards the mantle, clasped her hands, and then passed into the parlor and closed the door which led into it from the sitting room. In a very short time afterwards she heard a sudden noise above and then a sound as if two or three persons were running down stairs together, a woman screamed, and immediately afterwards she heard some one run down the first flight of stairs and through the entry to and out at the front door. The prisoner immediately afterwards opened the entry door into the sitting room and walking towards her exclaimed, "he has ruined my wife! he has ruined my wife"! and then, "my God *Page 253 
what have I done! My poor mother! My poor child!" and repeating these words several times he laid down on the floor with his face towards it. His wife also came into the sitting room just at that moment and said to him "Josseph, what made you do it? It was done without a cause. See what temper has brought you to." She then went to the front door and looked out, closed it and came into the sitting room again, then went into the kitchen and returned with a pail of water and a broom, and asked her if she would not wash the blood off the front steps and the pavement, for the whole town was in an uproar, and which she did for her. There was a good deal of blood marking the flight of the deceased down the stairs and through the entry, as well as on the front steps and the pavement. She saw nothing of her when she went back into the sitting room, but the prisoner was still lying on the floor of it with his face turned towards it, as when she went out of it. She then put on her hat and shawl and went home, and was not there any more that day. That was Monday, the 29th day of last April, and it was after 10 o'clock that morning when she reached home. When she heard the woman scream she recognized the voice as that of the prisoner's wife. There was blood running from her right hand when she first came into the sitting room after the disturbance had occurred, and she saw on the following Wednesday that the middle finger of her left hand had been severely cut.
The foreman of the paper-hangers who was the next witness, stated that he was at the house of the prisoner on Saturday, the 27th day of April last, at work papering the front room in the second story of it, and about half past 4 o'clock he heard the front door open and a person come in and with a quick and heavy step pass from it into the back parlor or sitting room, and in a minute after, Mr. Smith, the deceased, came up into the front room where he was at work, made some remarks about it and the paper, seemed pleased with the appearance of it, and soon left; and he left it, without finishing the papering of it, *Page 254 
about 7 o'clock that afternoon, and returned to his work upon it about half past 7 o'clock the next Monday morning, and after taking up into the room some paper he had brought with him, he went down into the sitting room to get a table where he saw a young woman sitting at the window sewing, but saw nothing of the prisoner or any other man about the house that morning, until about half past 9 o'clock when he heard the front door open and a person enter with the same quick and heavy footsteps, as on Saturday, and very soon Mr. Smith came up stairs and into the front room where he was, and again said he was pleased with the paper, and then turned on his heel and went out into the entry, and up the next flight of stairs into the third story he was satisfied, for had he gone down stairs he would have seen him; and in two or three minutes afterwards he heard a noise above as of the shuffling of feet or persons moving quickly over the bare floor, and very soon what sounded like a fall or a heavy jump upon it which jarred the windows and seemed to shake the house itself, and just then a lady's voice and a sudden shriek with the words "my Lord, Joseph what have you done"! and immediately after that footsteps coming fast and heavy down stairs and along the entry below until they seemed to pass out of the front door of the house; something was said by the lady before he heard the shriek, but he did not understand what it was she said. He also heard apparently light footsteps following the fast and heavy ones, dawn stairs immediately afterwards, but he saw no one as the door of the room was closed during the whole time. Another at work in the same room with him at the time was then examined as a witness and made the same statement with the addition, that he heard no one come up the first flight of stairs, or go up to the third story after the deceased had come up to the room they were at work in, o: after he had left it and gone up into the third story, but soon after the fast and heavy steps were heard going down stairs and out of the front door, he heard some one slowly coming down stairs groaning, and when he got *Page 255 
down stairs into the sitting room he heard him say, "Oh, my God." But just before that he heard light footsteps, and then in a minute after a person coming slowly down groaning as before mentioned.
The evidence for the State further showed that the wound was inflicted in the front room in the third story of the prisoner's house, and consisted of a single stab about four inches below the top of the left shoulder, being behind as well as below it, or on the back part of the left arm-pit, and extending around towards the front, two and a half inches in length and four inches at least in depth, made with a dagger or sheathed knife which was soon afterwards found lying on the floor with fresh blood on it, and with the scabbard or sheath of it also lying on the floor not far from it; and which were produced and proved and put in evidence. The deceased was so much exhausted by the flow of blood from it that he was unable to reach his home at the Indian Queen Hotel and died about 10 o'clock that morning. The physicians who had reached him but a few moments before he expired were of the opinion that the wound was not necessarily mortal, if he could have immediately had the proper attention and treatment from them, but under the circumstances it was a mortal wound and the cause of his death.
The evidence for the prisoner by a number of witnesses from Kimballville in Pennsylvania eighteen miles above Wilmington, showed that he and the deceased had long resided in that vicinity and were very intimate friends prior to their removal to Wilmington, and that whilst the prisoner was the keeper of a hotel in that place, and the deceased owned and resided on a farm a mile from it, he was a frequent visitor at the hotel, and more so when the prisoner was from home than when he was there; that when the prisoner was at home he always drove up and lighted from his carriage in front of the hotel and would have a friendly salutation with every one he knew about it, and acted as others did, but when he was away from home he always drove around and lighted in the yard in the rear *Page 256 
of the hotel, walked into the bar-room and took a drink, and then into the sitting room where he spent the whole of his stay in company with the prisoner's wife, and that he sometimes spent the night at the hotel, but never when the prisoner was at home; and according to the testimony of the bar-keeper that one night which he spent at the hotel in the absence of the prisoner, he came into the bar-room and told him he wished to go to bed, and that she had before informed him to put him in the front room, which was next to hers, and having left his over-coat in the barroom, and knowing that he always left the hotel very early, before retiring himself, he took it late at night up to his room, but found he was not there, although the bed in it had been occupied that evening. Afterwards the prisoner left the hotel, and took a private house in the place and removed his family to it, and the deceased was then observed according to the testimony of several witnesses, one of whom then resided next door, to continue his visits to the family, and frequently when the prisoner was away to stay all night at the house, and to leave it by the back-way early in the morning.
The son of the prisoner who had been examined as a witness on behalf of the State, was now recalled and examined as witness on his behalf, and stated that on the removal of his father's family to Wilmington they first resided in French street about a year, then removed for a year to No. 703 Jefferson Street, and from there to No. 523 Seventh Street on the 25th of March 1866. That his father and Mr. Smith were very friendly, and that he was intimate with their family. He used to come often to their house when they lived in French and in Jefferson Streets. His visits were to his mother, for he would come when his father was away, as he was always at his office in Sixth Street, except at meal times. His father went away to West Virginia while they lived in Jefferson Street, and after that his visits to their house were oftener than before. He had seen him there as often as seven times a week. He would come about seven o'clock in the *Page 257 
evening and stay a good while; that was at the house in Seventh Street after they moved there. He often sent him out for refreshments, ice cream, oranges or apples; they then had no family but himself and his mother. He had sometimes known him to leave before he went to bed. In August last year his mother went away and he went into the country on a visit to Louisville, Pa., and he wrote to his father in West Virginia that she had gone away and that he thought she was at his uncle's, Thomas Slack's, but afterwards wrote to him correcting it and told him she was at Mr. Hanse's. His father then came home. After that he had a suspicion that all was not right, and coming down stairs he found him in the dark without his coat, vest or shoes, and on two occasions in their back yard after nine o'clock at night, and when his father again came home in October last he told him of it. Another witness residing on Seventh Street testified that he had seen the deceased go to the house of the prisoner on that street almost every day.
Maxwell B. Ocheltree another witness for the prisoner stated that he was associated with him in business as real estate agents from June 1864 to June 1865 when the prisoner went to West Virginia, and that the prisoner and the deceased were intimate and particular friends, and the prisoner reposed entire confidence in him. When he came back in August last, the deceased was away from home, and he apprised him of the reports in circulation in relation to the improper intimacy between his wife and the deceased both in Wilmington and at Kimballville, at which he seemed thunderstruck and utterly speechless, for he held down his head and made no reply. The next time he saw him was on his return to Wilmington again in the month of October last, in the bar room of the deceased at the Indian Queen hotel. They were there together, and they went from there to a private room together to have a talk over the matter, but he declined to accompany them, although he was invited by both of *Page 258 
them to accompany them. The next time he saw the prisoner was during the evening of that day walking up Fifth street with the deceased. He stopped and bade him good bye, and did not see him again until he saw him in prison.
It is my duty, as well as my purpose, on the present occasion, to explain to you, as briefly as I can, so much of the law of homicide, as is applicable to the crimes of murder and manslaughter. And I take leave to say to you, in the outset, that no mere words, however violent, reproachful or offensive, can amount in law to a provocation sufficient to excuse even the slightest assault. And further, that even a slight assault will not excuse the use of a deadly weapon, so as to mitigate the offense, and reduce it below the grade of murder, in case death ensues from its use. *Page 260 
In order to reduce the crime to manslaughter, the provocation must be very great, — so great indeed, as to produce such a transport of passion, — or frenzy of the mind, — and heat of blood, as to render a man, for the time being, altogether deaf to the voice of reason. It must, in fact, be made to appear, by the evidence, to the satisfaction of the jury, that the killing was not the result of deliberate design or purpose, nor attributable to preconceived malignity of heart; but, on the contrary, was only and solely imputable to human infirmity or frailty. Whilst, on the one hand, murder always proceeds from a wicked depraved and malignant spirit, — from a heart regardless of social duty and perversely bent on mischief, and is always characterized by malice as a necessary ingredient; — manslaughter, on the other hand, results from acts of unpremeditated and thoughtless violence, and not from any malignity of heart, — acts proceeding from sudden heat of blood, and unreflecting rage, caused by adequate provocation, and not from deliberate design or purpose. Malice is the great test or criterion of murder. It distinguishes it from manslaughter. Malice is always present in murder as its characteristic and distinguishing feature; — but, in manslaughter, it is always absent; and hence, I say to you that wherever malice is shown to have been the impelling cause of the act committed, from which death has ensued, the crime must necessarily amount to murder. And I charge you further, that if the slayer, in the act of killing, exercised thought, consideration and reflection, and did the fatal act of purpose and design, his offense, instead of being reduced to manslaughter, will be murder; for, wherever there is thought, coolness and reflection, coupled with a purpose and design to take life, there is malice, — and malice, being the moving cause of the act, makes murder.
Having thus briefly, but I trust with sufficient plainness, explained to you the difference between murder and manslaughter, I may now say to you in further elucidation of the subject, that malice, legal malice, characterizes all *Page 261 
acts perpetrated with an evil intent, — all wrongful acts done intentionally without just cause or excuse, and in willful disregard of the rights or safety of others. Such is legal malice.
Now, gentlemen, let me say to you another word or two in regard to the question of malice. In the first place, I charge you, especially, to remember, during your entire deliberations, that whenever the fact of killing has been once proved, all circumstances of accident, necessity, or infirmity and of alleviation, extenuation, justification, or excuse, must be proved to your satisfaction by the prisoner, unless they happen to arise out of the evidence produced by the State against him; for the law, which is to be your guide in dealing with the evidence, presumes the fact of killing to be founded in malice, and therefore, amounting to murder, until the contrary is made to appear. And you will also bear in mind, in this connection, that malice in killing constitutes the murder. Under the law of this State, murder is divided into two degrees — first and second. Murder in the first degree, is where the crime is committed with express malice aforethought; and murder in the second degree is where the crime is committed with implied malice; which implied malice is an inference or conclusion of law, from facts actually proved. The statute, by which these two degrees of murder are established, does not in any respect change the general law of murder. The common law definition of murder, together with all the rules and principles applicable to the crime, remain as they were before the passing of the statute. Its only effect is to graduate or measure the punishment according to the degree.
Express malice may be defined to be where one person kills another with a sedate, deliberate mind and formed design, which formed design to kill, may be manifested in many ways, as for instance by laying in wait for the deceased, or by antecedent menaces or threats, disclosing a disposition on the part of the slayer to commit the act charged, or by former grudges, that is to say, *Page 262 
former ill-will, secret enmity, hatred, or sullen malevolence, towards the deceased, or concerted schemes to do him great bodily harm, or any other circumstances, calculated to disclose the inward fatal purpose or intention of the accused towards his victim.
Implied or constructive malice, being as I have already said, an inference or conclusion of law from facts actually proved before the jury, is implied by law from every deliberate, cruel act committed by one person against another, however sudden the act may be. For the law considers that he who does a cruel act voluntarily, does it maliciously.
And now, gentlemen, in order that you may have a definite idea of the distinction between the two degrees of murder, I here say to you, first, that wherever there exists a design or intention, deliberately formed in the mind of the accused, to take life, and death ensues from his act, it is murder with express malice, and consequently murder in the first degree. Secondly, where there exists no design or intention to take life, but death results from an unlawful act of violence on the part of the accused, and in the absence of adequate or sufficient provocation, it is murder with or by implied malice, and therefore murder in the second degree.
Again, the difference between murder and voluntary manslaughter may be seen in this: — voluntary manslaughter is the killing of another in sudden heat of blood, upon adequate provocation, and without malice, either express or implied; and therefore, where death ensues from such unpremeditated and thoughtless violence, upon sufficient provocation and without malice, it is manslaughter only. The law justly and mercifully requires that an act of violence, in order to amount to murder, must be done deliberately. But it is proper that I should say to you, and I say it emphatically, that no specific length of time is necessary to make an act a deliberate act in legal contemplation; for every act which is done designedly and of purpose, is in point of law, esteemed *Page 263 
to be a willful act, every willful act an intentional act, and every intentional act a deliberate act, so that if death ensue from such an act, it must be held to be a case of malicious killing, and therefore murder.
You all know, because common sense and reason declare it to be so, that even the most sudden and instantaneous act may be attended with circumstances which show beyond doubt, that it was the result of a deliberate purpose. Time, the lapse of time I mean, need not enter into the consideration, as part of deliberation, as an essential or necessary element; for if a design or intention to take life, be but the conception of a moment, it is sufficient. And if the slayer had time for thought, and thinking but for a moment, did intend to kill, and in fact did kill, it is just the same in legal contemplation as if he had intended it for a length of time, and killing under such circumstances, is held to be both deliberate and premeditated. As a general rule, it is the intention with which an unlawful act is done, that determines its criminality. As the intention of the perpetrator of an unlawful act is rarely declared by words, and as the eye of man can not penetrate to the hidden recesses of the heart, or mind, we are necessarily compelled to resort to surrounding circumstances, and to rely on them as the external manifestations of the inward hidden intention, with which the deed was done. The intention to take life may be disclosed in a variety of ways, and especially, may such intention be disclosed by the use of a deadly weapon, a weapon likely to take life, as for instance, where one person purposely shoots at another with a gun within striking distance, or strikes him on the head with an axe or a iron-bar or heavy bolt, or purposely stabs him with a sword or dagger, for these are all deadly weapons, and the use of them, in the absence of great provocation, must compel every reflecting mind to conclude that he who does such an act intended to kill.
Again, gentlemen, it is well settled in the law, as a rule of universal application, that every man is presumed to *Page 264 
contemplate and intend the ordinary and natural consequences of his own acts; so that, if a deadly weapon be used against the person of another, as it has a direct tendency to destroy life, the intention to take life, is a necessary conclusion from the nature and character of the act itself.
Having thus, gentlemen, stated to you, with as much brevity as the importance of the case would permit, the principles and rules of law, which should guide you in your deliberation, I now pass to the consideration of the two several grounds of defense, urged on behalf of the prisoner, and upon which he claims an acquittal at your hands.
And first, as to the adulterous intercourse, alleged to have existed between the deceased, Joshua P. Smith, and the prisoner's wife. The law on this subject is very plain and very easily understood; it is this: If a man find another in the act of adultery with his wife, and in the first transport of passion kills him, he is guilty of manslaughter only.
It is not sufficient to show that an adulterous intercourse has been, for some time prior to the act of killing, carried on between the deceased and the wife of the prisoner; nor is even positive knowledge on the part of the prisoner of such adulterous intercourse sufficient to mitigate the offense, and reduce it from the crime of murder, to manslaughter. No, it is not so. No matter with what certainty, or conclusiveness, the fact of adultery may have been proved, or how frequently, or how recently, the fact of adultery may have occurred, it amounts to nothing, even in mitigation of the offense, unless the prisoner found the deceased in the very act of adultery with his wife. The deceased must be taken in the very fact, and the accused must act, and act at once, under the sting of the then present provocation, and in the first transport of passion excited by such provocation. Nothing short of this will do. No suspicion, however vehement, no belief, however well founded, no knowledge however positive *Page 265 
and absolute, that an adulterous intercourse has previously existed, between the deceased and the prisoner's wife, can have the effect of mitigating, or reducing the crime, below the grade of murder.
I have already intimated to you that if the prisoner found the deceased in the act of adultery with his wife, and then, in the first transport of passion, excited by the then present provocation, killed the deceased, he is not guilty of murder, but of manslaughter only. For the law, in compassion for human infirmity, extends its indulgence to acts, springing from sudden passion, justly excited, by adequate provocation, when committed instantly, or before reflection has intervened, or reason has had time to resume its controlling power. But if the slayer, instead of killing the adulterer in the act, or, at the time of the adultery committed, kills him on the ground of suspicion or belief, or even on the ground of clearly ascertained and known previous adultery, his case is without palliation or excuse, and he is justly held to be guilty of the crime of murder. Killing under such circumstances, is not killing under adequate provocation; on the contrary, rather, it is killing from a feeling of hatred and revenge. And, gentlemen, allow me to say to you, in this connection, that whatever act is done, upon revenge, is done willfully, deliberately, and with malice, and, if death ensue, as the result of such act, it is murder.
In charging you, as I have done, that in order to reduce the crime from murder to manslaughter, it is necessary it should be shown, that the prisoner found the deceased in the very act of adultery with his wife. I do not mean to say, that the prisoner must stand by and witness the actual copulative conjunction between the guilty parties. If the prisoner saw the deceased in bed with the wife, or saw him leaving the bed of the wife, or if he found them together, in such a position, as to indicate with reasonable certainty to a rational mind, that they had just then committed the adulterous act, or were then and there about to commit it, it will be sufficient to satisfy the requirements *Page 266 
of the law in this regard, and if, under such circumstances, he then and there struck the mortal blow, his offense would amount to manslaughter only. But if he did not so find the deceased and his wife, in the act of adultery, but struck the mortal blow, in revenge for previous adultery, either suspected or known, he is guilty of murder.
The other ground of defense, relied on by the prisoner, is insanity; and, therefore, it is proper I should also explain to you the law on this subject. Insanity may be either total, or partial, in its character. So, also, it may be total and permanent; or, although total in its nature, it may be but temporary, in point of duration. Of course, a person totally and permanently insane, is incapable of committing any crime whatsoever; because, the will and judgment of the man, being overborne and obliterated by the malady, his act can not, justly, be considered the voluntary act of a free agent, but rather, the mere act of the body, without the consent of a directing or controlling mind. So, too, in regard to total, but temporary insanity. If the insanity be such, for the time being, as to utterly overwhelm the reason and conscience, the will and judgment, the accused can not justly be held criminally responsible for acts done during the continuance of such temporary insanity.
As I have just intimated, there may exist a state of mind called partial insanity, sometimes denominated in the law, monomania, or insane delusion, which delusion, consists in a fixed belief in the existence of certain things, purely imaginary, as real facts, when in truth they have no real existence whatever.
Insane delusion is that diseased state or condition of the mind, which gives to airy nothing a local habitation and a name. But in this case, it is insisted that the cause was not imaginary, but that it was real and substantial.
Now, whether partial insanity is of such a character as to exempt a person from criminal responsibility for wrongful acts, is always a question of vital importance; and its *Page 267 
solution must necessarily depend upon the nature and intensity of the delusion, the force or degree of its controlling power over the will and conscience, — and especially and above all, — whether the act which is charged as constituting the crime, was committed under the direct and irresistible influence of such insanity. Partial insanity, even when it is clearly shown to exist, is not always or necessarily an excuse for crime. There are many varying shades of it — many degrees of it. It may becloud the intellect but a very little, or, it may becloud it utterly, in respect to a particular subject. In order to exempt a person from responsibility for a criminal act, the controlling power of the insanity, whether arising from delusion or from a real cause, must be so intense and overwhelming as utterly to deprive the party of his reason in regard to the act charged as criminal. The enquiry is always in a case like this, narrowed down to the plain, sharp question of the insanity of the prisoner at the time, and in respect to the criminal act charged against him. Was he at the time, and as touching that act, sane or insane? The insanity must have specific reference to the particular act charged as constituting his offense. The question is not whether he was insane on any subject whatever, but whether he was insane in respect to the particular act charged against him. If it were otherwise, there would be a total exemption from punishment for crime committed under any species of partial insanity, notwithstanding the fact that such insanity might not in any degree have impaired the mental capacity of the accused, to distinguish between right and wrong in respect to the particular act charged as constituting his crime. If the prisoner had sufficient capacity at the time to distinguish between the right and wrong of that particular act — if he had sufficient capacity to know that that act was wrong, he is responsible for it, and for all its fatal consequences.
If, however, you shall be satisfied from the evidence before you, that at the time when the mortal blow was given, the prisoner had not a sufficient degree of reason *Page 268 
to enable him to distinguish between the right and wrong of that act; if, in other words, his reason was at the time so overborne or obliterated as to render him incapable of knowing or comprehending that that act was wrong, he is not criminally responsible for it, however fatal the result may have been. But, if at the time the act was committed, he possessed sufficient mental capacity to comprehend the nature or character of the act and its probable consequences; or if he understood the nature of the act he was doing, and had reason sufficient to know that it was wrong to do it, he is legally and justly responsible for such act, notwithstanding he may at the time have been laboring in some degree under partial insanity. For, after all has been said that can be said in elucidation of the subject, we are compelled to return to the plain and simple question whether the prisoner, at the time he committed the act, had sufficient mental capacity to distinguish between right and wrong in respect to that act. If he had, he is responsible; if he had not, he is not responsible. Now, in this case, the criminal act charged against the prisoner is the felonious killing of Joshua Pusey Smith with express malice aforethought, to which charge, as we have seen, he sets up the defense of insanity, and claims at your hands an acquittal on this ground. If he has sustained this plea by satisfactory evidence, he should be acquitted; if he has failed to establish the fact of insanity by satisfactory proof, he ought not to be permitted to escape punishment on this ground; and if he killed the deceased, he should be convicted. And now, gentleman, before taking leave, altogether, of the question of insanity, it is my further duty to state to you, at least briefly, certain primary and cardinal rules or tests, by which, under your oaths, you must be guided, in order to arrive at a proper solution of this question.
The first great rule, on this subject is this: Every man is presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary be proved to the satisfaction of the jury. This rule *Page 269 
is fundamental, and of universal application; it meets you at the very commencement of your enquiries, and you must carry it with you in all your deliberations. You must, therefore, gentlemen, fully understand and remember, throughout all your investigations that the prisoner is to be considered by you, to be a sane man, and capable of committing crime, until his insanity shall be clearly, or satisfactorily established by the evidence; on this ground you must take your stand, firmly and squarely, if you expect ever to arrive at a just or proper decision of this case.
In the next place, insanity being matter of defense, the second great rule is, that the burden of showing it, lies on the prisoner. It must be proved as any other fact, to the satisfaction of the jury. If the proof does not arise out of the evidence offered by the State, the prisoner must establish the fact of insanity by distinct evidence and prove it, beyond a reasonable doubt; otherwise the presumption of sanity or soundness of mind will remain unrebutted and in full force. Exhibitions of mere eccentricity of mind, manner, or conduct, mere passionate jealousy, or vehement suspicion of adultery, however well founded, or showing that the prisoner was at times afflicted with a sort of mental strabismus, or squinting of the mind, will not be sufficient to excuse him from the consequences of his criminal acts. The law requires more than this; the proof must go beyond this; the proof must establish the fact, that the prisoner, at the time he committed the act of killing, was incapable of distinguising between right and wrong in respect to that fatal act.
Having thus stated to you the general law of felonious homicide, as well as the rules and principles of law applicable to the grounds of defense relied on by the prisoner, I now reverse the order in which I have presented these several matters, and charge you, in conclusion, as follows:
First. If you shall be satisfied from the evidence, beyond a reasonable doubt, that the prisoner, at the time he struck the mortal blow, was laboring under such a *Page 270 
disease of the mind as to render him, for the time being, incapable of distinguishing between the right and wrong of that act, you should acquit him, on the ground of insanity, and should so return your verdict.
Secondly. If however, you shall not be satisfied from the evidence that he was, at the time of committing the act, an insane man, then it will be your duty to consider, whether he found the deceased in the act of adultery, with his wife, and then and there, in the first transport of passion, instantly inflicted the mortal blow. If you shall be satisfied from the evidence that the prisoner killed the deceased, Joshua P. Smith, in such a position, under such circumstances, then he is guilty of manslaughter under our statute, and your verdict should be guilty of manslaughter in killing the said Joshua P. Smith whilst in the act of adultery with the prisoner's wife.
Thirdly. But if you shall not be satisfied from the evidence, that the prisoner found the deceased in the act of adultery with his wife and then and there, in the first transport of passion, instantly struck the mortal blow, but that, on the contrary, he killed the deceased on the ground of previous acts of adultery, then, we say to you, that he is guilty of murder, either in the first or second degree, and in which degree you must determine from the evidence.
And in order to aid you in passing on this question, I repeat to you, that wherever there exists a design or intention deliberately formed in the mind of the accused to take life, and death ensues from his act, it is murder with express malice, and therefore, murder in the first degree.
But where there exists no design or intention to take life, but death results from an unlawful act of violence on the part of the accused, and in the absence of adequate or sufficient provocation, it is murder by or with implied malice, and consequently murder in the second degree.
 Verdict — "Not guilty, by reason of insanity." *Page 271